

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID J. NUYANNES**, Individually,   : <br> 1435 Kynlyn Drive, Wilmington DE, 19809 : <br> PLAINTIFF   : <br>   : <br> v.       : <br>   : <br>   : <br> **PENNSYLVANIA STATE POLICE**   : | Civil Action No. <br><br> **11    4478** |

**GERARD McSHEA**, Individually and in :
his official capacity as a Pennsylvania State :
Trooper 1342 West Baltimore Pike, :
Media, PA  19063 :
and :

Jury Trial Demanded

**FILED**

JUL 1 2 2011

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

**JAMES P. BRADLEY**, Individual,  and in :
official capacity as Judge, 201 West Front :
Media Pa, 19063 :
and :
**MICHAEL TSUNG**, Individually and in :
his official capacity as a Pennsylvania State :
Trooper, 1342 West Baltimore Pike, :
Media, PA  19063 :
and :
**T BARNETT**, Individually and in :
his official capacity as a Pennsylvania State :
Trooper, 1342 West Baltimore Pike, :
Media, PA  19063 :
and :
**GARY FASY**, Individually and in :
his official capacity as a Pennsylvania State :
Police Sergeant, 1342 West Baltimore Pike, :
Media, PA  19063 :
and :
**TED MALONE**, Individually and in :
his official capacity as a Pennsylvania State :
Trooper, 1342 West Baltimore Pike, :
Media, PA  19063 :
and :
**LOUIS MARCOZZI**, Individually and in :
his official capacity as a Constable for :
Middletown Township, 469 S. Old :
Middletown Road, Media PA. 19063. :
and :

**EDWARD MURPHY**, Individually and in   :
his official capacity as a Pennsylvania State  :
Constable, 1342 West Baltimore Pike,     :
Media, PA  19063                       :
and
**G. MICHAEL GREENE**, Individual, and  :
in official capacity as District Attorney,    :
201 West Front **Street** Media Pa, 19063   :
 and                               :

**BRIAN DOHERTY**, Individual, and      :
in official capacity as AssitantDistrict Attorney,
201 West Front Street Media Pa, 19063    :
 and                               :
                                    :

**VARIOUS JOHN AND JANE DOES**    :
                                    :
                                    :

         DEFENDANT (S)         :

## NATURE OF THE ACTION

1. Plaintiff, David J. Nuyannes, brings this action on behalf of himself, and seeks to recover damages caused to the Plaintiff by Defendants' actions. The Defendants, singularly and/or collectively, illegally terminated Plaintiff's custody rights, failed to inform him of such, issued a felony warrant for Interference with Custody of a Child, harassed Plaintiff's friends and family, hunted down the Plaintiff with stakeouts and search warrants, seized his vehicle, arrested and incarcerated Plaintiff, then attempted to coerce him to plead guilty, purportedly because Plaintiff taking his daughter to Friendly's to celebrate her birthday with ice cream and birthday presents was a crime. It is worth noting that Defendants had to have known that Plaintiff **would** see his daughter on her birthday, and knew he would be completely unaware of the court order they put in place because no one served him with it, thereby intentionally setting up his subsequent arrest. Defendants' acts of harassment, false arrest, false imprisonment, malicious prosecution, illegal search and seizure, unlawful use of a civil procedure, police misconduct, falsifying a police report, conspiracy, false declarations before grand jury or court and civil action for deprivation of rights, pursuant to the following, *inter alia*: Title 18 U.S.C. § 241 Conspiracy against rights; Title 18 U.S.C. § 242 Deprivation of rights under color of law; Title 42 Chapter 21 Civil Rights; Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges; Title 18 U.S.C. § 1621 Perjury generally; Title 18 U.S.C. § 1622 Subornation of perjury; Title 18 U.S.C. § 1623 False declarations before grand jury or court; Title 42 U.S.C. § 1983 Civil action for deprivation of rights; Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights; Title 42 U.S.C. § 1981 Equal rights under the law; Title 109 U.S.C. §2234 Authority

exceeded in executing warrant; and Title 109 U.S.C. §2235 Search warrant procured maliciously.

## JURISDICTION

2.  Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332, this Court has subject matter jurisdiction over the claims stated herein because this civil action arises under federal law (See FLSA, 29 U.S.C. § 201, et seq.), none of the Defendants is a citizen of the same state as the Plaintiff, and the amount in controversy exceeds $75,000. Additionally, this court has Supplemental and Pendent Jurisdiction pursuant to 28 U.S.C. § 1367(a).

## VENUE

3.  Venue is proper in the United States District Court, Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. 1391(b)(1) because one or more of the Defendants reside in this District and, upon information and belief, all of the Defendants are considered to reside in the Commonwealth of Pennsylvania for the purposes of determining venue.

## THE PARTIES

4.  Plaintiff, David J. Nuyannes, resides at 1435 Kynlyn Drive, Wilmington, DE 19809.
5.  Defendant, **THE PENNSYLVANIA STATE POLICE,**
6.  Defendant, **GERARD McSHEA**, Detective Pennsylvania State Police, and individual, 1342 West Baltimore Pike, Media PA. 19063.
7.  Defendant, **MICHAEL TSUNG**, Trooper Pennsylvania State Police, and individual, 1342 West Baltimore Pike, Media PA. 19063.

8. Defendant, **T BARNETT,** Trooper Pennsylvania State Police, and individual, 1342 West Baltimore Pike, Media PA. 19063.

9. Defendant, **GARY FASY,** Seargent Pennsylvania State Police, and individual, 1342 West Baltimore Pike, Media PA. 19063.

10. Defendant, **TED MALONE,** Trooper Pennsylvania State Police, and individual, 1342 West Baltimore Pike, Media PA. 19063.

11. Defendant, **THOMAS M. GILHOOL,** Trooper Pennsylvania State Police, and individual, 1342 West Baltimore Pike, Media PA. 19063.

12. Defendant, **LOUIS JOHN MARCOZZI,** Constable for Middletown Township, Delaware County, and individual, 469 S. Old Middletown Road, Media PA. 19063.

13. Defendant, **EDWARD MURPHY,** Delaware County Constable, and individual, 1342 West Baltimore Pike, Media PA. 19063.

14. Defendant, **BRIAN DOHERTY,** individually and  in his official capacity as Delaware County Assistant District Attorney, 201 West Front Street, Media, PA  19063

15. Defendant, **G. MICHAEL GREENE,** individually  and in his official capacity as Delaware County District Attorney, 201 West Front Street, Media, PA  19063

16. Defendant, **JAMES P. BRADLEY,** Judge and **JAMES P. BRADLEY,** individual, Judges Chambers, 201 West Front Street, Media PA. 19063.

17. **VARIOUS JOHN AND JANE DOES**

## **SUBSTANTATIVE ALLEGATIONS**

18. The Defendants individually and/or collectively violated the following Title 18 U.S.C. § 241 Conspiracy against rights; Title 18 U.S.C. § 242 Deprivation of rights under color of law; Title 42 Chapter 21 Civil Rights; Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges; Title 18 U.S.C. § 1621 Perjury generally; Title 18 U.S.C. § 1622 Subornation of perjury; Title 18 U.S.C. § 1623 False declarations before grand jury or court; Title 42 U.S.C. § 1983 Civil action for deprivation of rights; Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights; Title 42 U.S.C. § 1981 Equal rights under the law; Title 109 U.S.C. §2234 Authority

exceeded in executing warrant; and Title 109 U.S.C. §2235 Search warrant procured maliciously.

19. The felony criminal charges against Plaintiff Nuyannes were dismissed on May 4, 2010, fourteen months after the warrant was issued and ten months after NUYANNES was arrested and incarcerated. Attached is the Nolle Prosequi dismissal signed by the District Attorney and the Honorable Patricia Jenkins marked as Exhibit "L." The Pennsylvania State Police from the Media barracks troop K committed Police Misconduct by committing two false arrests, harassment, illegal searches, illegal traffic stops and illegally seizing and holding my property. This all stemmed from a complaint filed by a local business woman, Louise King, whose family has owned a restaurant for the past 25 years one block from the Delaware County Court House, and who obviously was receiving preferential treatment due to her local connections. A large portion of the family restaurant's business during the weekdays comes from the employees of the court house, lawyers, Judges, Sheriffs and the local police. No crime was ever committed Plaintiff Nuyannes or Elaine Bassill, and the Pennsylvania State Police knew it. Prior to this incident, neither Nuyannes nor Elaine Bassill had ever committed a crime, been arrested or had any criminal record. Below is the sequence of events starting with the February 23, 2008 court order and ending with the dismissal of the case by the District Attorney on May 4, 2010.

20. On or about February 23, 2009, the Honorable James Bradley sua sponte terminated Plaintiff Nuyannes' custody rights at an ex-parte divorce proceeding. It was not a custody hearing, the Honorable James Bradley was not the custody judge, neither party was notified that custody issues would be heard at the hearing, and Plaintiff was not present at said hearing. Plaintiff Nuyannes discovered that Judge Bradley was not allowed to terminate his custody rights at this hearing when he received a letter from his Lawyer in February 2010. The letter included the following case law. The statute of limitations is tolled until the injured party should reasonably have found out about the claim.

    a. The Superior Court of Pennsylvania has vacated custody orders when there was not a petition to modify custody before it, when the parties were not served with an order to appear for a custody modification hearing, and when there was no

notice that custody modification would be at issue in the proceedings. In Langendorfer v. Spearman, 2002 PA Super 93,797A.2d 303, the father argued that the trial court could not permanently modify custody without having a petition for modification before it. The Superior Court of Pennsylvania found the father's due process rights were violated by the actions of the trial court. The order to appear did not notify the parties that custody would be at issue, and the father did not have notice that custody would be at issue. Only the contempt issue was actually before the trial court at the hearing in the instant case. Without notice that custody was at issue, the trial court could not assume that the parties had sufficiently exposed the relevant facts or properly argued their significance. The trial court committed a clear abuse of discretion. The orders of the trial court were vacated, and the previous custody order was reinstated. Langendorfer v. Spearman is strikingly similar to Nuyannes v. Nuyannes in that it was not a custody hearing and no notice that custody would be at issue was given. Both hearings were contempt hearings.

b. In Everett v. Parker, 2005 PA Super 404,889A.2d 578, appellant mother challenged an order from the Court of Common Pleas of Lankawanna County (Pennsylvania), which found her in contempt of a custody order, and which transferred custody of her child to appellee father. The mother argued that she was not properly informed of the custody hearing. The court found that the form of the father's notice did not comply with the requirements of Pa. R. Civ. P. 1915.12(a). Also Rule 1915.12(d) required personal or mailed service. The mother was not informed of either the contempt allegations, as required by Rule 1915.12(b), or that custody would be an issue at the contempt hearing. Without meaningful notice, the ex parte orders violated the mother's due process rights and the trial court abused its discretion in transferring custody. The Superior Court of Pennsylvania vacated both the contempt order and the custody order. As a result the court reinstated the parties' original custody order.

c. In Nuyannes v. Nuyannes, proper notice was not given to David Nuyannes that the custody contempt hearing was to occur on February 23, 2009 and that custody would be at issue at said hearing.

d. In Nuyannes v. Nuyannes there was no petition to modify custody before the court on February 23, 2009. It was a divorce and contempt hearing. No notice was given to Plaintiff Nuyannes that a petition for custody modification was entered because there was not a petition to modify custody. Pursuant to Pa.R.C.P. 1915.12(d) the petition shall be served upon the respondent by personal service or regular mail. No answer to the petition shall be required. If service is by mail, the hearing on the petition shall not be held sooner than seven days after mailing of the petition unless the court for cause shown orders an earlier hearing. If the respondent fails to appear, the court shall continue the hearing and may order personal service by the sheriff or constable, or alternative service as accepted by the court, of the petition and notice of a new hearing date or the court may issue a bench warrant for production of the respondent in court and not for imprisonment. The court sua sponte terminated Plaintiff Nuyannes' custody rights at the ex-parte hearing. The court could not modify custody without having a petition for modification before it.

e. Plaintiff Father's custody rights were terminated; Father was arrested, incarcerated, and charged with the felony Interference with Custody of a Child. The affidavit of probable cause states, in pertinent part, that Plaintiff took his daughter to Friendly's for ice cream to celebrate her 15th birthday on March 3, 2009. See the attached affidavit of probable cause. Exhibit P

21. A true and correct copy of the aforementioned February 23, 2009 court order is attached hereto, marked Exhibit "A," and incorporated by reference as though fully set forth herein.

22. Plaintiff Father was found in contempt of a non-existent court order on February 23, 2009 and a non-existent agreement.

23. On March 3, 2009, Plaintiff Father took his daughter to Friendly's for ice cream and gave her presents to celebrate her 15th birthday. She was returned to school 53 minutes later. Plaintiff Father had not been notified or served with the court order which had illegally terminated his custody rights eight days earlier.

24. On or about March 4, 2009, the alleged victim, Nicole Elyse Nuyannes, allegedly contacted Officer Michael Tsung of the Pennsylvania State Police complaining she

received, in celebration of her 15th birthday, ice cream and presents from her Plaintiff Father. A Criminal Complaint was filed by Nicole's mother, Louise Marie King.

25. On or about March 4, 2009, an Affidavit was filed by Trooper Michael Tsung of the Pennsylvania State Police, Troop K, Media, charging Plaintiff Father with the felony offense, Interference With Custody of Children 18 Pa.C.S.A.§ 2904 (a)(1).

26. A true and correct copy of the aforementioned Complaint and Affidavit is attached hereto, marked Exhibit "B," and incorporated by reference as though fully set forth herein.

27. On or about March 5, 2009, a felony arrest warrant was issued for Plaintiff Father by the Pennsylvania State Police. The police had not verified that the court order was served to Plaintiff Father, nor was it served. Plaintiff Father could not possibly comply with a court order which he did not receive.

28. Plaintiff Father did receive an email from his attorney summarizing what had occurred at the February 23, 2009 hearing. The attorney omitted the part about Plaintiff Father losing custody. The attorney at the time of the hearing was Nichole Marie Thompson who remains in a close personal relationship with her former fiancée Trooper Gerard McShea (see attached photo, Exhibit N). Through this relationship, Nichole Thompson has made friends with many of PSP Lima state troopers.

29. A true and correct copy of the aforementioned Felony Warrant of Arrest and email from Plaintiff's attorney is attached hereto, marked Exhibit "C and D," and incorporated by reference as though fully set forth herein.

30. Taking a 14 year old daughter out of school for fifty three minutes, buying her ice cream, giving her presents and returning her to school before the end of the school day does not breach the mother's custody.

31. Since the alleged actions of Nuyannes clearly did not fall within the scope of the statute for a felony or a misdemeanor under 18 Pa.C.S.A.§ 2904 (a)(1) or any other statute in the crimes code, Nuyannes alleges the Pennsylvania State Police and the District Attorney's office performed harassment, false arrest, malicious prosecution, illegal search and seizure, unlawful use of a civil procedure, police misconduct, falsifying a police report, conspiracy, false declarations before grand jury or court and civil action for deprivation of rights.

32. On or about March 6, 2009, Trooper Gerard McShea arrived at 6000 Village Way, Apartment 206, Boothwyn PA, 19061, residence of Nuyannes' parents, James and Claire Nuyannes. Trooper Gerard McShea said he had a search warrant and proceeded to search the premises looking for Plaintiff Father. The State Police searched each room, under beds, in closets and behind furniture. Plaintiff Father never resided at this address. Over the next couple of months, the police returned to Plaintiff Father's parent's house about six more times to search and question my parents as to my whereabouts. A white police surveillance van was seen several times in parking lot at my parent's retirement community.

33. On or about March 6, 2009, Plaintiff Father received a voicemail from Trooper McShea, in which McShea states in pertinent part, "I just left your parent's house, I will continue to bother your parents until you turn yourself in." Plaintiff Father still has the voicemail and can produce it at trial or discovery. Detective McShea kept his promise to continue to harass James and Claire Nuyannes as well as many others detailed below.

34. On or about March 6, 2009, three law enforcement officials arrived at 238 Howarth Road, Media, PA 19063. Residing at this address were Russell Chuckran, Elaine Bassill, and their five children. The officer said he had a warrant for Plaintiff Nuyannes' arrest and searched the premises. Nuyannes never resided at this address. Law enforcement was searching these residences to harass Plaintiff Father's friends and family.

35. On or about March 19, 2009, Trooper Gerard McShea obtained a search warrant for Plaintiff Father's phone records from March 1, 2009 to March 19, 2009.

36. A true and correct copy of the aforementioned Search Warrant and Affidavit is attached hereto, marked Exhibit "E," and incorporated by reference as though fully set forth herein.

37. On or about April 7, 2009, Trooper Bret Kahler conducted a search at the Hill Top Hotel on Baltimore Pike, The Express Inn on SR352, and the Sentinel Motel. Trooper Bret Kahler states that he questioned the staff at the Sentinel Motel. Trooper Bret Kahler states in his incident report that the report will be supplemented pending the apprehension of the Defendant. The incident report is dated April 6, 2009, **one day before** the actual search of the hotels on April 7, 2009. Nuyannes had and has never stepped foot on any of these locations, and has no idea why they would search these locations.

38. A true and correct copy of the aforementioned Incident Report is attached hereto, marked Exhibit "F," and incorporated by reference as though fully set forth herein.

39. Approximately one month after the felony warrant was issued for the ice cream charge; a voice mail was left on Plaintiff Father's cell phone by Trooper Gerard McShea. He stated he would continue to bother Plaintiff Nuyannes' parents until Plaintiff turned himself in. Plaintiff still has a copy of that voice mail. Phone records can verify the correct date.

40. On or about May 2, 2009, Trooper Gerard McShea and Trooper Barnett arrived again at 238 Howarth Road searching for Plaintiff Nuyannes. Elaine Bassill allowed them to enter the house and look around. Trooper McShea said they had their "own warrant for David, not related to the domestic" case. Trooper Barnett threatened that if Plaintiff Father did not turn himself in, Plaintiff Father was going to get hurt, angrily moving his fists in front of his chest as if he were punching someone, and implying this is what would happen to Plaintiff Nuyannes.

41. On or about May 26, 2009, Elaine Bassill backed out of her driveway at 7:55 pm to pick up her son from baseball practice at AMLL and noticed a white car parked on the street one house south of her property. As she proceeded to Glen Riddle Road, the lights of the unmarked State Police car came on, and Trooper McShea stopped her just one house north of her home. McShea said, "I have to ask you, is David in the car?" Then he proceeded to question Elaine Bassill for half an hour. He told her Plaintiff Father was not paying child support.

42. On or about May 27, 2009, Trooper McShea circled the street on Howarth Road in the afternoon, passing Elaine Bassill as he turned onto Mount Alverno Road and she was turning onto Howarth Road on her way home.

43. On or about May 28, 2009, Trooper Gerard McShea showed up at the AMLL baseball field around 8:00 pm, pulling behind Elaine Bassill's parked car in his unmarked white police car. Elaine Bassill's son Emanuel said, "Mommy, there's Gerry." She had Emanuel get in the car and stay there until Trooper Gerard McShea finally left.

44. On or about May 29, 2009, Trooper Gerard McShea drove down Howarth Road, passing Elaine Bassill's son when he was walking home from the bus stop at 4:05 pm.

45. After first finding out that a felony warrant was outstanding for Plaintiff Nuyannes at the end of May 2009, James Nuyannes went to Magisterial District Judge Walter Strohl to

inquire about the warrant that he signed for Plaintiff's felony charge. Judge Strohl stated that he only signed it and any questions should be addressed to the officer who requested the warrant. Judge Strohl then called the PSP and asked if Trooper Tsung was in the barracks. Judge Strohl told James Nuyannes that Trooper Tsung was at the barracks and that Plaintiff's father should go talk to him. Approximately five minutes later Plaintiff's father arrived at the PSP Media barracks to inquire about the warrant for Plaintiff's arrest. Trooper Gilhool told him Trooper Tsung was just called away on a "dead body case" and was not available.

46. Plaintiff's father returned the next day to politely inquire again about the warrant. Plaintiff's father was turned away. Plaintiff's father returned yet again the next day and Trooper Gilhool asked him to step outside the barracks. Trooper Gilhool then threatened to arrest my 75 year old father if he asked any more questions. Plaintiff's father then left and did not return or ask any more questions.

47. On the morning of June 1, 2009, Elaine Bassill observed a white police surveillance van adjacent to her property on 238 Howarth Road.

48. On June 3, 2009, Trooper Gerard McShea obtained a search warrant for the Cadillac SRX VIN: 1GYEE637780120516 registered to Plaintiff Nuyannes. Trooper McShea seized the vehicle from the driveway of 238 Howarth Road, Media, PA.

49. A true and correct copy of the aforementioned Search Warrant and Affidavit is attached hereto, marked Exhibit "G," and incorporated by reference as though fully set forth herein.

50. In support of his Application, Trooper Gerard McShea provides, in pertinent part, the following: "That vehicle has been seen for several weeks in the driveway of 238 Howarth Road, Middletown Twp, Delaware County, Pennsylvania...I am requesting that a search warrant be signed so that we may seize that vehicle and search its contents for any information leading to NUYANNES location."

51. On June 3, 2009, someone from the State Police came to 238 Howarth Road and towed away the Cadillac after asking Gabriel, 14, Elaine Bassill's oldest son at home at the time, for the car keys. Gabriel was quite upset when he called to tell his mother the State Police had taken Mr. Nuyannes's car. Shortly thereafter, Gabriel called his mother again to tell her the State Police had returned and Mr. Marcozzi, AMLL Snack Bar Manager,

was there. Then Louis Marcozzi, a constable, got on the phone and told Elaine Bassill he had a bodily search warrant and was going to search the house. Elaine Bassill told him he could not search her home. Constable Marcozzi asked Elaine where she was and she told him she was on the Blue Route. Constable Murphy then flashed his gun towards the 14 year old Gabriel while entering the house. Before Elaine Bassill arrived at home, they had separated the four children and proceeded to interrogate each of them, ages 14, 12, 10 and 7, as to my whereabouts, asking, "did he just leave an hour ago," and "were you told to lie?" Constables Murphy and Marcozzi had finished thoroughly searching their entire home; including asking 10 year old Daniel for a ladder so they could search the attic. At least one Trooper was banging on the walls as he went from room to room searching. Seven year old Emanuel watched as Constable Marcozzi threw a bag of his stuffed animals across the room while looking for Plaintiff. Constable Marcozzi then screamed at Emanuel, saying "you're lieing! Where is he?!"

52. This search of the house and the interrogation of the children all occurred prior to their mother Elaine Bassill's arrival on the property. Trooper McShea and Constable Marcozzi, plus Trooper Gilhool, Constable Murphy, and Detective Fasy were in the driveway when Elaine Bassill arrived home.

53. Prior to the officers leaving, Elaine Bassill asked Sergeant Fasy for the names of the Officers in her driveway. He got a piece of paper and wrote them down for her. He also wrote the name of F. Beatty Chadwick at the top of the paper. He explained Chadwick had been incarcerated at the George Hill Correctional facility for the past 14 years on contempt of court relating to a divorce case. This was a highly publicized case due to his length of incarceration. F. Beatty Chadwick was incarcerated longer than anyone in US history for contempt of court. He was accused of hiding millions of dollars in off shore accounts preventing his wife from getting her half. Plaintiff's wife also had accused him of having money hidden in off shore accounts.

54. A true and correct copy of the aforementioned hand written note from Sergeant Fasy is attached hereto, marked Exhibit "H," and incorporated by reference as though fully set forth herein.

55. Two years have passed since the PSP took Plaintiff Nuyannes' car and the property has still not been returned.

56. There was not probable cause to seize and hold the property.

57. On or about June 15, 2009, Trooper Gerard McShea obtained a search warrant for the phone records of Elaine Bassill from March 1, 2009 to the present.  To obtain the warrant, Trooper Gerard McShea falsely claims in the Affidavit that Plaintiff Nuyannes was living with Elaine Bassill. Plaintiff Nuyannes never lived at said address and Trooper Gerard McShea did not provide any evidence supporting his statement that he did in fact live with Bassill.

58. A true and correct copy of the aforementioned Search Warrant and Affidavit is attached hereto, marked Exhibit "I," and incorporated by reference as though fully set forth herein.

59. On or about June 16, 2009, James Nuyannes, Plaintiff's father, went to the Pennsylvania State Police barracks in Lima, and asked to have the Cadillac returned. James Nuyannes was told he could not get the vehicle back because they needed it as evidence.

60. On July 6, 2009, Elaine Bassill was driving to the baseball field and turned left onto Pennell Road from Glen Riddle Road when she saw lights go on behind her and was pulled over by the State Police. She immediately wondered if she had done something wrong until she saw Trooper Ted Malone walking toward her car, knowing it was more of the State Police harassment she had been experiencing. She asked him why he was pulling her over.  Ted said "they told me to stop you to ask if David Nuyannes is in the car."  When she asked who "they" were, he said nothing, adding he had to pull her over because she was driving a rental car.  Then Elaine Bassill told Trooper Malone they (the State Police) should know she was driving a rental because the state police came and took the report in the middle of the night just a day earlier when her car window was smashed by Louise King. Ted said he would like nothing more than to be able to prove that it was Louise King. He looked at the rental agreement and left. Elaine Bassill felt shaken up because she could not take their constant, random harassment anymore.

61. On or about July 9, 2009, Trooper Gerard McShea obtained two additional search warrants for my credit card records from March 4, 2009 to July 9, 2009.

62. A true and correct copy of the aforementioned Search Warrants and Affidavit is attached hereto, marked Exhibit "J," and incorporated by reference as though fully set forth herein.

63. On July 13, 2009, after being arrested by Trooper McShea for the felony charge, Nuyannes asked Trooper Gerard McShea in the police barracks if he could have his car

back. Trooper Gerard McShea replied, "No, we need it as evidence." Logically, one would assume the vehicle or its contents provided some sort of evidence to the ice cream felony charge. No discovery has been provided in relation to the vehicle or its contents. Nuyannes then asked as to the whereabouts of the vehicle. Trooper Gerard McShea said he did not know where it was. The property has not been returned as of the date of this complaint.

64. It is possible the police lost the seized property since they claim to not know where it is. A copy of the Property Record dated June 3, 2009 included in the discovery shows that the vehicle was in storage area 5. A true and correct copy of the aforementioned Property Record is attached hereto, marked Exhibit "J", and incorporated by reference and as though fully set forth herein.

65. On or about August 23, 2009, while Nuyannes was still incarcerated on the ice cream charge, Jill Nuyannes, his sister, asked the state police at the Lima Barracks if they would return the vehicle. Detective Fasy responded that Trooper McShea was the only one who could answer questions about the case.

66. Nuyannes' Federal and State Constitutional protections were violated as the Affidavit of Probable Cause was wholly lacking the requisite particularity necessary for the issuance of a search warrant, let alone seizing it and keeping it.

67. "The standard for evaluating whether probable cause exists for the issuance of a search warrant is the 'totality of the circumstances test' as set forth in Illinois v. Gates, 462 U.S. 213 (1983) and adopted by [The Pennsylvania Supreme Court] in Commonwealth v. Gray, 503 A.2d 921, 925 (1985)." Commonwealth v. Jones, 668 A.2d 114, 116 (1995). "A magistrate is to make a 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, concluding the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. 116-117 (citations omitted).

68. "Before a search warrant can be issued upon probable cause, the affidavit must set forth the underlying circumstances from which the informer concluded that the items to be seized were where he said they were, and must also recite circumstances from which the issuing authority can determine whether the informant is reliable or his information

credible. (Commonwealth v. Barba, 460 A.2d 1103, 1105. (Pa. Super. 1983) (citations omitted). The issuing authority must consider the informant's prior reliable information, whether the informant's story was corroborated by any other sources, whether the informant's statements were a declaration against penal interest, and whether the defendant's reputation supports the informant's tip. Id. (citations omitted). In Barba, the police identified a named informant who described goods stolen during a recent robbery. The informant also gave the date and locations of the crime and said that he had seen the stolen goods delivered to the defendant by a burglar, whom he identified. Id. An independent police investigation confirmed the occurrence of the burglary and identified the stolen goods described by the informant. Id.

69. Nuyannes asserts that his Fourth Amendment and State Article 1, section 8 constitutional protections were violated where the application for the search warrant failed to indicate the source of the alleged material misrepresentation or on what such misrepresentation was based; and there is no indication whatsoever that there was a fair probability that contraband or evidence of a crime or evidence of the defendant's whereabouts would be found in a particular place.

70. Assuming arguendo any of the facts alleged in the Affidavit of Probable Cause were true, the Affidavit falls significantly short of the totality of circumstances standard necessary to justify the issuance of a search warrant, the seizure of the vehicle or the police keeping it.

71. As the Affidavit of Probable Cause was wholly lacking, the Search Warrant should never have been issued.

72. On or about June 15, 2009, Trooper Gerard McShea obtained a search warrant for the phone records of Elaine Bassill from March 1, 2009 to the present. To obtain the warrant, Trooper Gerard McShea falsely claims in the Affidavit that Nuyannes was living with Elaine Bassill. Nuyannes never lived at said address and Trooper Gerard McShea did not provide any evidence supporting his statement that he did.

73. A true and correct copy of the aforementioned Search Warrant and Affidavit is attached hereto, marked Exhibit "I," and incorporated by reference as though fully set forth herein.

74. On or about July 9, 2009, Trooper Gerard McShea obtained two additional search warrants for Nuyannes' credit card records from March 4, 2009 to July 9, 2009.

75. A true and correct copy of the aforementioned Search Warrants and Affidavit is attached hereto, marked Exhibit "J," and incorporated by reference as though fully set forth herein.

76. On July 6, 2009, Elaine Bassill was driving to the baseball field and turned left onto Pennell Road from Glen Riddle Road when she saw lights go on behind her and was pulled over by the State Police. She immediately wondered if she had done something wrong until she saw Trooper Ted Malone walking toward her car, knowing it was more of the State Police harassment she had been experiencing. She asked him why he was pulling her over. Ted said "they told me to stop you to ask if David Nuyannes is in the car." When she asked who "they" were, he said nothing, adding he had to pull her over because she was driving a rental car. Then Elaine Bassill told Trooper Malone they (the State Police) should know she was driving a rental because the state police came and took the report in the middle of the night just a day earlier when her car window was smashed by Louise King. Ted said he would like nothing more than to be able to prove that it was Louise King. He looked at the rental agreement and left. Elaine Bassill felt shaken up because she could not take their constant, random harassment anymore.

77. On July 13, 2009, Elaine Bassill and Plaintiff Nuyannes were lured to a Lawyer's office in Philadelphia on the pretense Plaintiff Nuyannes would be defended and protected as he turned himself into authorities.

78. Instead, Elaine Bassill and Plaintiff Father were arrested by Defendant Thompson's boyfriend and former fiancée, Trooper Gerald McShea, a detective in the Pennsylvania State Police Troop K, as part of a sting operation. This planned arrest in the lawyer's office was scheduled on Defendant Thompson's thirtieth birthday, July 13, 2009, apparently a birthday present from her boyfriend.

79. Later that night, Plaintiff Father was incarcerated by Trooper Gerald McShea and bail was set at $50,000 cash.

80. Plaintiff Father was incarcerated later that night at the George Hill Correctional facility. Elaine Bassill posted bail and was released that night. Neither of us committed a crime and neither of us should have been arrested. Nuyannes asked Trooper McShea twice to speak to his lawyer, and both times he told him "you are not entitled to a lawyer". While chained to a bench, Elaine Bassill was approached several times by Sergeant Gary Fasy. Sergeant Fasy told her she was a beautiful, smart woman and that he did not want her

caught in the middle of this mess. Another Trooper walked by and told Elaine Bassill she was "the best looking criminal they ever had in custody."

81. On July 13, 2009, bail was set at $50,000 cash for Nuyannes taking my daughter out for ice cream, a felony charge, Interference with Custody of a Child.

82. A true and correct copy of the aforementioned Bail Information is attached hereto, marked Exhibit "O," and incorporated by reference as though fully set forth herein.

83. On or about August 8, 2009, bail was reduced to $15,000/10%.

84. On or about August 20, 2009, Nuyannes was arraigned in the Delaware County Court of Common Pleas.

85. On August 25, 2009, Nuyannes' father posted bail and he was released from prison and taken to the courthouse by the sheriff's department to sign the bail papers. Nuyannes was then immediately arrested again and taken directly back to prison. No paperwork was provided for the arrest. Nuyannes asked the Sheriff why they were taking him back to prison and the Sheriff replied "a new warrant was just issued for your arrest and you were sentenced to another 40 days in prison." I don't know the Sheriff's name but I have seen him several more times and can identify him.

86. On August 26, 2009, bail was refunded to Plaintiff Nuyannes' father.

87. The trial was originally scheduled for October 19, 2009.

88. In October 2009, Plaintiff Nuyannes was offered a plea agreement that would reduce the Felony to a Misdemeanor, time served and two years of probation. Plaintiff Nuyannes declined and said he wanted a trial. He was offered the same thing in January and February of 2010. Nuyannes declined and said he wanted a trial. In April and May of 2010, Plaintiff Nuyannes was offered ARD. He declined and said he wanted a trial. On May 3, 2010, the DA offered to dismiss the case if Plaintiff Nuyannes signed something waiving his right to sue the Pennsylvania State Police. He declined and said he wanted a trial. On May 4, 2010, Plaintiff Nuyannes again was offered the same deal by the DA. He declined and said he wanted a jury trial. On May 4, 2010, the day of jury selection, the DA finally moved the "Court to Order a Nolle Prosequi". The case was dismissed with all "costs being paid by the county." Nuyannes was not required to sign anything. They were obviously trying to get Nuyannes to plead to anything so he would not be able to file a complaint against the Police or sue the Police civilly. The police and the District Attorney

knew they had no case, should not have arrested Plaintiff Nuyannes, should not have thrown him in prison, and violated his civil rights as well as those of other people mentioned herein.

89. A true and correct copy of the aforementioned executed "Application For Nolle Prosequi" is attached hereto, marked Exhibit "L," and incorporated by reference as though fully set forth herein.

90. Plaintiff Nuyannes had approximately fifteen (15) court dates between his arrest on July 13, 2009 and the Nolle Prosequi on May 4, 2010. Approximately eight of the court dates were during his incarceration between July 13, 2009 and his release from prison on January 10, 2010. While incarcerated, Nuyannes was repeated shackled, hand cuffed and temporarily placed into a holding cell with murderers, thieves, drug dealers, drug addicts and other assorted felons. Plaintiff Nuyannes asserts that the District Attorney and the Assistant District Attorney prosecuting the case maliciously prosecuted him. It should not have taken fourteen (14) months and fifteen (15) court dates to determine the charges did not meet the statute before they dropped the charges. See attached Exhibit M for the criminal docket showing the activity in the case.

91. In summary, the Defendant's illegally terminated Plaintiff's custody rights, failed to inform him of such, issued a felony warrant for Interference with Custody of a Child, harassed Plaintiff's friends and family, hunted down the Plaintiff with stakeouts and search warrants, seized his vehicle, arrested and incarcerated Plaintiff, then attempted to coerce him to plead guilty, purportedly because Plaintiff taking his daughter to Friendly's to celebrate her birthday with ice cream and birthday presents was a crime. It is worth noting that Defendants had to have known that Plaintiff **would** see his daughter on her birthday, and knew he would be completely unaware of the court order they put in place because no one served him with it, thereby intentionally setting up his subsequent arrest.

# INJURIES

92. By reason of defendants' outrageous acts, including harassment, false arrest, false imprisonment, malicious prosecution, illegal search and seizure, unlawful use of a civil procedure, police misconduct, falsifying a police report, conspiracy, false declarations

before grand jury or court and civil action for deprivation of rights, the acts perpetrated by defendants' would cause the minor children to lose their Father, Father to lose his custody rights of his children, Father to lose his freedom, and  Father to lose his accounting career, that caused susceptibility to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomach aches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings. Accordingly plaintiff is entitled to special damages.

## FIVE CLAIMS

93. Plaintiff wishes to include the following FIVE CLAIMS and alleges the Defendants violated the following rules and laws in each of these claims detailed in item 88. Plaintiff re-alleges and incorporates paragraphs 1-86 of the complaint herein. By reason of defendants' outrageous acts that caused the minor children to lose their Father, Father to lose his custody rights of his children, Father to lose his freedom, and  Father to lose his accounting career, that caused susceptibility to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomach aches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings.

94. By virtue of the foregoing, the Defendants are liable to Plaintiff for harassment, false arrest, false imprisonment, malicious prosecution, illegal search and seizure, unlawful use of a civil procedure, police misconduct, falsifying a police report, conspiracy, false declarations before grand jury or court and civil action for deprivation of rights by violating Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Title 18 U.S.C. § 1621 Perjury generally, Title 18 U.S.C. § 1622 Subornation of perjury, Title 18 U.S.C. § 1623 False declarations before grand jury or court, Title 42 U.S.C § 1983 Civil action for deprivation of rights, Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights and  Title 42 U.S.C. § 1981 Equal rights under the law. The following rules of Professional Conduct were violated by Defendant Thompson:

   **a.** Rule 1.1 Competence:

# FIRST CLAIM: MALICIOUS PROSECUTION

95. Plaintiff realleges and incorporates paragraphs 1-94 of the complaint as though fully incorporated herein.

96. In relentlessly pursuing criminal charges and prosecution of Plaintiff, Defendants acted with the intent to inflict injury and with the realization that injury was substantially certain to result from their conduct. Knowing that their actions could cause the minor children to lose their Father, Plaintiff Father to lose his custody rights of his children, Plaintiff Father to lose his freedom, and Plaintiff Father to lose his accounting career, and Plaintiff Father to be susceptible to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomachaches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings.

97. The original criminal case against Plaintiff was terminated in his favor; see attached Nolle Prosequi (Exhibit L).

98. The Defendants played an active role in pursuing criminal charges and prosecution of Plaintiff.

99. The Defendants did not have probable cause to issue the warrant or reasonable grounds to support the original charges or prosecute the Plaintiff.

100.      The Defendants initiated or continued the initial case with an improper purpose. Plaintiff asserts that the Defendants acted in order to prevent a malpractice lawsuit against attorney/friend, to cover up the Judge's illegal actions, and to aid a local business owner involved in a divorce action with Plaintiff.

101.      Malicious prosecution is actionable under the Fourth Amendment of the United States Constitution.

102.      For the reasons stated herein, Plaintiff is entitled to special damages and compensatory damages.

103.      By virtue of the foregoing, Defendants are liable to Plaintiff for harassment, false arrest, false imprisonment, malicious prosecution, illegal search and seizure, unlawful use of a civil procedure, police misconduct, falsifying a police report, conspiracy, false declarations before grand jury or court and civil action for deprivation of rights due to their willful, reckless, malicious violation and wanton disregard of Plaintiff's civil rights, the Defendants violated Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Title 18 U.S.C. § 1621 Perjury generally, Title 18 U.S.C. § 1622 Subornation of perjury, Title 18 U.S.C. § 1623 False declarations before grand jury or court and Title 18 U.S.C. § 876   Mailing threatening communications, Title 42 U.S.C. § 1983 Civil action for deprivation of rights, Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights and  Title 42 U.S.C. § 1981 Equal rights under the law.

## SECOND CLAIM:
## INTENTIONAL AND RECKLESS DISREGARD

104.      Plaintiff realleges and incorporates paragraphs 1-103 of the complaint as though fully incorporated herein.

105.      Defendants acted with intentional and reckless disregard with the intent to inflict injury and with the realization that an injury was substantially certain to result from their conduct. Knowing that their actions could cause the minor children to lose their Father, Plaintiff Father to lose his custody rights of his children, Plaintiff Father to lose his freedom, and Plaintiff Father to lose his accounting career, and Plaintiff Father to be susceptible to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomachaches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability,

appetite loss, loss of freedom and earnings. Accordingly, Plaintiff is entitled to special damages and compensatory damages.

106.     Defendants' actions complained of herein were conscious, intentional, wanton, and malicious, entitling Plaintiff to an award of punitive damages and compensatory damages

107.     By virtue of the foregoing, Defendants are liable to Plaintiff for perjury, extortion and conspiracy due to their willful, reckless, malicious violation and wanton disregard to follow the Pennsylvania Professional Rules of Professional Conduct committing the following crimes in the process, Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Title 18 U.S.C. § 1621 Perjury generally, Title 18 U.S.C. § 1622 Subornation of perjury, Title 18 U.S.C. § 1623 False declarations before grand jury or court and Title 18 U.S.C. § 876  Mailing threatening communications. Title 42 U.S.C. § 1983 Civil action for deprivation of rights, Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights and  Title 42 U.S.C. § 1981 Equal rights under the law.

# **THIRD CLAIM:**
# **OUTRAGEOUS CONDUCT**

108.     Plaintiff realleges and incorporates paragraphs 1-107 of the complaint as though fully incorporated herein.

109.     The Defendants acted with conduct so outrageous that it exceeds all bounds of common decency usually tolerated by a civilized society. Knowing their conduct could cause the minor children to lose their Father, Father to lose his custody rights of his children, Father to lose his freedom, and Father to lose his accounting career, that caused susceptibility to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomach aches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings. Accordingly, Plaintiff is entitled to special damages and compensatory damages.

110.     Defendants' actions complained of herein were conscious, intentional, wanton, and malicious, entitling Plaintiff to an award of punitive damages and compensatory damages

111.     By virtue of the foregoing, Defendants are liable to Plaintiff for perjury, extortion and conspiracy due to their willful, reckless, malicious violation and wanton disregard to follow the Pennsylvania Professional Rules of Professional Conduct committing the following crimes in the process, Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Title 18 U.S.C. § 1621 Perjury generally, Title 18 U.S.C. § 1622 Subornation of perjury, Title 18 U.S.C. § 1623 False declarations before grand jury or court and Title 18 U.S.C. § 876 Mailing threatening communications, Title 42 U.S.C. § 1983 Civil action for deprivation of rights, Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights and  Title 42 U.S.C. § 1981 Equal rights under the law.

# FOURTH CLAIM:
# NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

112.     Plaintiff realleges and incorporates paragraphs 1-111 of the complaint as though fully incorporated herein.

113.     By reason of defendants' outrageous acts and negligent and intentional infliction of emotional distress that caused the minor children to lose their Father, Father to lose his custody rights of his children, Father to lose his freedom, and Father to lose his accounting career, that caused susceptibility to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomach aches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings. Accordingly, Plaintiff is entitled to special damages and compensatory damages.

114.     Defendants' actions complained of herein were conscious, intentional, wanton, and malicious, entitling Plaintiff to an award of punitive damages and compensatory damages

115.      Injuries were proximately caused by the Defendants by their negligent conduct and willful violation of the Pennsylvania Professional Rules of Professional Conduct, it would cause the minor children to lose their Father, Father to lose his custody rights of his children, Father to lose his freedom, and  Father to lose his accounting career, that caused susceptibility to emotional distress and physical injury and mental anguish, including but not limited to bodily injury such as stomach aches, sleep loss, nightmares, feelings of worthlessness, paranoia, humiliation, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings. Accordingly, Plaintiff is entitled to special damages and compensatory damages.

116.      Defendants' actions complained of herein were conscious, intentional, wanton, and malicious, entitling Plaintiff to an award of punitive damages and compensatory damages

117.      By virtue of the foregoing, Defendants are liable to Plaintiff for perjury, extortion and conspiracy due to their willful, reckless, malicious violation of and wanton disregard to follow the Pennsylvania Professional Rules of Professional Conduct committing the following crimes in the process, Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Title 18 U.S.C. § 1621 Perjury generally, Title 18 U.S.C. § 1622 Subornation of perjury, Title 18 U.S.C. § 1623 False declarations before grand jury or court and Title 18 U.S.C. § 876  Mailing threatening communications, Title 42 U.S.C. § 1983 Civil action for deprivation of rights, Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights and  Title 42 U.S.C. § 1981 Equal rights under the law.

## FIFTH CLAIM:
## ABUSE OF PROCESS: UNLAWFUL USE OF CIVIL PROCEDURE [1]

118.      Plaintiff realleges and incorporates paragraphs 1-117 of the complaint herein.

119.      Defendants, with malice, used the legal process to accomplish a purpose for which it was not designated and with knowledge their outrageous acts would cause the minor children to lose their Father, Father to lose his custody rights of his children, Father to lose his freedom, and   Father to lose his accounting career, that caused susceptibility to emotional distress and physical injury and mental anguish, including but

not limited to bodily injury such as stomach aches, sleep loss, nightmares, feelings of worthlessness, paranoia, feelings of depression anger and irritability, appetite loss, loss of freedom and earnings. Accordingly Plaintiff is entitled to special damages and compensatory damages.

120.     Defendants' actions complained of herein were conscious, intentional, wanton, and malicious, entitling Plaintiff to an award of punitive damages and compensatory damages.

121.     By virtue of the foregoing, Defendants are liable to Plaintiff for perjury, extortion and conspiracy due to their willful, reckless, malicious violation and wanton disregard to follow the Pennsylvania Professional Rules of Professional Conduct committing the following crimes in the process, Title 42 U.S.C § 1985 Conspiracy to interfere with civil rights (3) Depriving persons of rights or privileges, Title 18 U.S.C. § 1621 Perjury generally, Title 18 U.S.C. § 1622 Subornation of perjury, Title 18 U.S.C. § 1623 False declarations before grand jury or court and Title 18 U.S.C. § 876 Mailing threatening communications, Title 42 U.S.C. § 1983 Civil action for deprivation of rights, Title 42 U.S.C. § 1986 Conspiracy to interfere with civil rights and Title 42 U.S.C. § 1981 Equal rights under the law.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff David Jay Nuyannes prays for entry of judgment against the Defendants named within this complaint:

1.  for compensatory damages in the amount of $4,816,263;

2.  for special damages (punitive) in the amount of $2,000,000;

3.  for Award of Attorney's Fees per 42 U.S.C. § 1988 : US Code - Section 1988: Proceedings in vindication of civil rights (b) Attorney's fees

4.  for all costs of suit herein to be awarded; and

5.  for any and all such other and further relief as the court may deem just and proper.

---

[1] If investigation or discovery discloses additional rules or laws broken or additional people were involved (Doe's) then Plaintiff will amend complaint to assert a cause of action thereunder.